COURT OF APPEALS OF WEST VIRGINIA.          57

Jan'y Term,          Hobbs, et. al., vs. Interchange.          1865.

# 𝔚𝔥𝔢𝔢𝔩𝔦𝔫𝔤.

### HOBBS, TAYLOR & CO. *vs.* THE STEAMBOAT INTERCHANGE.

#### January Term, 1865.

1. Where a bill of sale is executed from one party to another, for a steamboat navigating the Ohio river, and delivery of posession accompanies the act thereby rendering the sale complete, there is no such right of ownership or title in the vendor as would authorize a creditor of the vendor, to attach the boat under the 5th* section of chap. 151 of the Code of Virginia, for money due on an account of materials furnished in building and equipping said boat.

2. The act of registration passed by the Congress of the United States, July 20th, 1850, 9 vol. U. S. statutes at large, page 440; which provides for the registry of bills of sale executed for vessels belonging to the United States, does not apply to persons having actual notice of the sale; and possession and use of a chattel is notice of ownership in the possessor.

3. The doctrine relative to sales of chattels, decided in *Chapman vs. Campbell* 13 Grattan 109, reaffirmed.

On the 29th day of May, 1855, *Hobbs, Taylor & Co.*, of the city of *Wheeling*, sued out of the clerk's office of the circuit court of *Ohio* county an attachment against the steamboat "*Interchange*" then navigating the Ohio river, under the 5th section of chapter 151 of the code of Virginia: alleging that they had just cause of action against the owners of said boat for the sum of 4,396 dollars and 80 cents, with interest and costs of protest. The attachment was duly levied on the same day, but the boat was released from the custody of the sheriff by *Andrew Wilson* who executed a bond according to law.

The plaintiffs filed with their declaration a bill of particlars as follows: "The owners of the steamboat *Interchange*

---

*The 5th section provides that, when any person has instituted suit against the commander of any steamboat or other vessel, &c., or against the owner of any such vessel, of any raft or river craft navigating the Ohio river, &c., for materials, supplies or labor furnished or bestowed in the building, repairing, equipping, navigating or attending upon the same, &c., he may forthwith sue out of the clerk's office an attachment against the defendant's estate, or against the vessel, raft or river craft, of which he is the owner or commander with all her tackel, apparel and furniture.

58 COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term, Hobbs, et. al. vs. Interchange. 1865.

"to *Hobbs, Taylor* & *Co.*, Dr., 1854, Nov. 25, to furnishing "materials, making, building and putting into the steam-"boat *Interchange*, the machinery and steam-engine for pro-"pelling said boat by steam, 4,396 dollars and 80 cents."

At the term of the circuit court held for *Ohio* county in June, 1856, on motion of *John Fink* and *Andrew Wilson* they were permitted to file their interpleader, stating that at the time of the issuing and levying of the plaintiff's attachment against and upon said steamboat, they were sole owners of the same, cabin, hull, engines and all equipments belonging to the boat, and that the claim of the plaintiffs upon which their attachment was founded was contracted by former owners thereof, of which owners neither of the petitioners were; and therefore they prayed that the boat and all the equipments might be discharged from the attachment. On the 11th day of July, 1856, the cause was tried by the court, the parties waiving a trial by jury, and judgment was entered for the petitioners and costs were awarded them against the plaintiffs.

During the trial it was proven that the boat was built by the *Central Ohio* railroad company, a corporation resident of the State of *Ohio*; that the engines had been built, and placed in the boat by the plaintiffs, and the hull was built by the defendants; that it was used by the *Baltimore and Ohio* R. R. Co. and the *Central Ohio* railroad company for the mutual interchange and transportation of freight and passengers from *Benwood* on the east bank of the *Ohio* river to the depot of the *Central* railroad company at Bellair on the west bank; that soon after the boat was built, and on the 15th day of January, 1855, the *Central Ohio* railroad company sold to the defendants, *Fink* and *Wilson*, the boat and its equipments for the sum of 16,500 dollars, and made a bill of sale for the same signed by *J. H. Sullivan* its president, which was duly acknowledged before *A. J. Pannell* surveyor of customs at *Wheeling*; that at the time of the execution of the bill of sale the *Ohio* company and the defendants entered into an agreement, whereby the said defendants agreed to pay in six, twelve and eighteen months after date with interest from

date, such sum as should be ascertained to be the cost of said boat, by *James S. Wheat* who was chosen a mutual referee for the purpose; that the notes executed to said defendants for work and materials furnished should be delivered up as part payment of the purchase money; that any bills and lawful claims against said boat for furnishing and equipping the same should, when paid by said defendants, be credited to them, also in part payment; that said defendants would transport all passengers, freights and mails across the *Ohio* river, at the points before designated, when required to do so by either of the railroad companies, heretofore mentioned, and that defendants should have the right to charge and collect from all passengers between Bellair and *Wheeling* or *Moundsville* a sum not exceeding twenty-five cents each, and certain amounts per ton for all freights transported or to be transported over the *Central Ohio* railroad from *Bellair* to several points specifically designated. In consideration whereof, the *Central Ohio* company guaranteed to the defendants the receipt in gross of the sum of 75 dollars per day for the period of three years, Sundays excluded. There was a further provision that the *Ohio* company could at any time annul and terminate the agreement by paying to the defendants the cost of the boat and they were to retain the earnings to the day of such repurchase.

It was further proven that upon the execution of the bill of sale and agreement, the defendants took possession of the boat and so held it until the levying of the attachment, on the 29th of May, 1855. The plaintiffs established the justness of their claim, by nine certain notes of the *Central Ohio* company, signed by the president, and that said notes were given on account of the building and construction of the engines of said boat; it was also proven that the defendants *Fink* and *Wilson* knew that the plaintiffs had built the engines and that the *Ohio* company was indebted to them on that account at the date of contract.

To the finding of the court on the foregoing facts the plaintiffs excepted, and applied to the district court of the

tenth district, for a writ of error, which was granted; and by operation of law the case was removed to this court.

*J. S. Wheat* and *Daniel Peck* for the plaintiffs in error.
*Z. Jacob* and *M. C. Good* for the defendants in error.

HARRISON J., delivered the opinion of the court.

On the 29th day of May, 1855, the plaintiffs in error sued out of the clerk's office of the circuit court of *Ohio* county, an attachment against "the owners of the steamboat *Interchange*, a vessel navigating the *Ohio* river," for money owing from such owners to the plaintiffs.

The attachment was levied on the boat then in possession of the defendants in error, who claimed to be the owners of the boat, and they executed bond with security and released the boat from the custody of the sheriff. On the 18th of May, 1856, the defendants in error appeared in the circuit court and filed their petition, stating that they were the owners of the boat. On the 11th day of July, 1859, the parties appeared by their attorneys, and by their consent the court proceeded to try the cause in lieu of a jury; the court having heard the evidence, rendered judgment for the defendants and dismissed the attachment. The plaintiffs took a bill of exceptions to the opinion of the court, in which the facts proved on the trial are certified.

It appears that in the year 1854, the boat was built for the *Central Ohio* railroad company, a corporation of the State of *Ohio*, under an arrangement between that company and the *Baltimore* and *Ohio* railroad company, by which the boat was to be used in transferring freight and passengers across the *Ohio* river between *Benwood* in *Virginia* and *Bellair* in *Ohio*. The hull of the boat was constructed by the defendants for the *Ohio* company, and the engines and other machinery were made and put on board the boat by the plaintiffs for the *Ohio* company; the boat was built at *Wheeling*. For the engines and other machinery, the *Ohio* company became indebted to the plaintiffs in the sum of money for which the attachment issued. After the boat was finished and equipped

COURT OF APPEALS OF WEST VIRGINIA.          61

Jan'y Term,          Hobbs, et. al. vs. Interchange.          1865.

for the service for which it was built, the *Ohio* railroad company on the 15th of January, 1855, sold and delivered the boat to the defendants, and executed to them a bill of sale in the following words:

"This deed, made the 15th day of January, in the year 1855, between the *Central Ohio* railroad company, party of the first part, and *John Fink* and *Andrew Wilson*, parties of the second part: witnesseth, that the said party of the first part in consideration of the sum of 16,500 dollars to it paid by said parties of the second part, the receipt whereof is hereby acknowledged, hereby grant unto said parties of the second part the steamboat *Interchange*, her cabin, hull, engines, furniture and equipments, as she now is in the *Ohio* river, at the railroad landing at *Bellair*, in *Belmont* county, in the State of *Ohio*.

In testimony whereof said *Central Ohio* railroad company hath hereto caused its corporate seal to be affixed, and signed by *John H. Sullivan*, its president, the day and year above written.          J. H. SULLIVAN, *President*,
          *Central Ohio* railroad company, [seal.]"

And at the same time the parties entered into an agreement in these words:

"Memo. of an agreement made and entered into this 15th day of January, 1855, at Bellair, in *Belmont* county, in the State of *Ohio*, between the *Central Ohio* railroad company by *John H. Sullivan* and *S. R. Hosmer*, a committee duly appointed and authorized by the board of directors of said company of the first part, and *John Fink* and *Andrew Wilson*, of *Ohio* county and State of *Virginia*, of the other part.

"The said *Central Ohio* railroad company, by the committee before named, has this day sold and conveyed unto the said *John Fink* and *Andrew Wilson* the steamboat called the *Interchange*, her engines, furniture, tackle and equipment, as she now lies in the *Ohio* river, at the landing of Bellair, *Belmont* county, *Ohio*. In consideration whereof the said *Fink* and *Wilson* agree to pay to said railroad company, in three instalments, payable, six, twelve and eighteen months

after date, with interest from this date, such sum as shall be ascertained and awarded to be the cost of said boat to said company, by *James S. Wheat,* the referee mutually chosen by said parties, said cost to be the aggregate of the bills incurred by said company for the building, equipping, and fitting out and furnishing said boat as she now lies, and the said *Fink* and *Wilson* to have the benefit of any credits on time given to said company for any part of said bills: it being agreed by said *Fink* and *Wilson* that if the nett profits of said boat shall be realized faster than the said payments shall mature, as hereinbefore provided, that then the amount of such profits shall be applied as received to the liquidation of said payments of the purchase money of said boat.    It is also further understood and agreed that the notes of said railroad company, made and delivered to said *Fink* and *Wilson* for account of their work and materials on said boat, shall be delivered up to said company as part of the purchase money thereof; and that any claims and debts that have lawfully accrued against the said boat, either for building, equipping, furnishing or running thereof, when satisfied or paid by said *Fink* and *Wilson,* shall be credited to them as payments on the purchase money of said boat.    In consideration of the guarantee hereinafter given on the part of the said *Central Ohio* railroad company, they, the said *Fink* and *Wilson,* agree to transport across the *Ohio* river between Bellair and *Benwood,* Bellair and the city of *Wheeling,* or Bellair and *Moundsville* or *Elizabethtown,* as may be required by the officers or agents of said railroad company, so far as the capacity of said boat or the state of the navigation of the *Ohio* river shall permit, for the space of three years from the date of this agreement, all freight, passengers, baggage and mails of the United States, which shall be delivered on the western bank of the *Ohio* river from the *Central Ohio* railroad, or shall be delivered or received on the eastern bank of the *Ohio* river, at either of the points before mentioned, to be carried or transported on said *Central Ohio* railroad, said freight, passengers, baggage and mails to be at all times carried safely and expeditiously, and having the

priority and preference over any and all other business that may be offered to said boat.

"In consideration whereof the said *Central Ohio* railroad company agrees that said *Fink* and *Wilson*, for each and every ton of freight loaded on said boat, transported across the *Ohio* river and unloaded from said boat, shall charge, claim and receive from the consignees not exceeding the following rates, viz: Between Bellair and *Benwood*, fifty cents; between Bellair and what is called Eoff's landing in the city of *Wheeling*, seventy-five cents; between Bellair and *Elizabethtown* or *Moundsville*, one dollar; or between any two points from *Wheeling* to *Moundsville*, directly across the *Ohio* river, fifty cents; the said charges for transporting said freight to be collected in all cases from the owner or consignee thereof, unless otherwise specially agreed, to be paid upon delivery. The same rates are to be charged for all freight delivered on board said boat and discharged from it in the cars in which it may have been or shall thereafter be transported, the weight of the car not being included or charged; empty cars to be transported free of charge. In consideration of the guarantee hereinafter mentioned, the said *Fink* and *Wilson* agree to transport all passengers, baggage and mails from or for the said *Central Ohio* railroad company free of charge, running the said boat for that purpose at all times according to the schedule of the trains of the said railroad company, so as to secure as close a connection therewith as practicable; provided that the said *Fink* and *Wilson* shall have the right to charge and collect from each passenger between Bellair and the city of *Wheeling* or *Moundsville*, a sum not exceeding twenty-five cents for the transportation of said passenger and baggage.

"In consideration whereof, the said *Central Ohio* railroad company guarantees to said *Fink* and *Wilson* the receipt of the gross sum of seventy-five dollars per diem upon an average for each year, excluding Sundays and such days as said boat shall not make her regular trips from any cause, to enure, accrue or be received to or by the said *Fink* and *Wilson*, from freight to be offered or loaded on said boat at

64        COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,        Hobbs, et. al., vs. Interchange.        1865.

the rates before mentioned, which may be destined for or have been transported over the *Central Ohio* railroad. The deficit of said guarantee to be ascertained at the end of each year and paid to said *Fink* and *Wilson*, by said *Central Ohio* railroad company. It being the meaning and intention of the parties hereto, that there shall be offered to said boat freight to and from said *Central Ohio* railroad, to an amount sufficient, at the rates before mentioned, to secure to the owners thereof, the daily average gross sum of seventy-five dollars for each year, excepting from computation Sundays and such days as said boat shall not make her regular trips; the said rates of charge to be collected by said *Fink* and *Wilson*, from the owners and consignees of said freight, at their own risks as is done by other common carriers. It is understood and agreed that the said Central Ohio railroad company may at any time annul and terminate this agreement, upon the payment to *Fink* and *Wilson* of the cost of said steamboat, as ascertained under this agreement, reserving to them the earnings of said boat and the advantage of the said guarantee, computed to the day of said re-purchase, in which event the said *Fink* and *Wilson*, shall, by proper bill of sale duly acknowledged, re-convey the said steamboat to the said Central Ohio railroad company, free from any lien or encumbrance. Witness the following signatures, the day and year first hereinbefore written.

J. H. Sullivan,<br>
S. R. Hosmer,<br>
<i>Central Ohio Railroad Company.</i><br>
John Fink,<br>
Andrew Wilson."

The sale bill was acknowledged before the surveyor of the port of *Wheeling*, by the President of the *railroad company*, the day of its date, and the surveyor endorsed on the bill the acknowledgement thereof. It does not expressly appear to have been recorded. That at the time of the issuing and levying the attachment, the boat was in the possession of the defendants, under their contract of purchase; that the *Ohio* railroad company was indebted to the

plaintiffs the sum of 4,396 dollars and 80 cents at the time the attachment issued, and was also indebted to the defendants for the construction of the hull of the boat. At the time the defendants purchased the boat, they knew the plaintiffs had so built the engines for the boat and that the *Ohio company* was indebted to the plaintiffs on that account, and that debt was one of the debts mentioned in the agreement. Upon this state of facts, this court is required to determine, whether the judgment of the circuit court shall be affirmed or reversed.

The plaintiffs in error insist in their assignment of errors, that the defendants *Fink* and *Wilson* had not the absolute right of property in the boat; that the bill of sale and agreement amount only to a conditional sale; and in the argument of the cause the attorney for the plaintiffs suggests, that the sale bill and agreement constitute a mortgage, only, by the *Ohio company*, to secure all the debts incurred by it in building, equipping and fitting the boat for service; and that the debts due the plaintiffs and defendants, were secured by the mortgage and consequently the boat was liable to be taken under the attachment and sold for their debts.

The plaintiffs further insist that the bill of sale is not valid, because it has not been recorded in the office of the collector of customs at *Wheeling*, and not being recorded as required by the act of Congress passed July 20, 1850, found in Brightly's digest 833, and 9 vol. laws U. S. statutes at large, 440, is not admissible and competent evidence to prove title to the boat in the defendants; that the want of registration of the bill of sale of the boat as required by that act, left the right of property in the *Ohio company*, and the boat liable to be taken under the attachment.

The cause has been ably argued in this court, and with the aid of that argument and the authorities bearing on the questions discussed, to which I have had access, my opinion formed on careful and deliberate consideration of the subject is, that the judgment of the circuit court ought to be affirmed; and in obedience to the mandate of our state con-

66         COURT OF APPEALS OF WEST VIRGINIA.

Jan'y Term,       Hobbs, et. al., vs. Interchange.      1865.

stitution, I proceed to give a brief and concise statement of my reasons for affirming the judgment.

If the contract for the sale of the boat divested the right of property out of the railroad company, and vested it in the defendants, and the defendants were debtors for the boat to the railroad company, the plaintiffs misconceived their remedy for the recovery of their debt; they should have taken out their attachment, summoned the defendants as garnishees, and subjected the debt owing by them to the *Ohio company*, to the plaintiff's demand.

The most satisfactory definition of a consummated contract for the sale of a personal chattel will be seen in 13 Grattan, page 109, Chapman *vs.* Campbell; it is "where there is a contract for an immediate sale of a chattel, and nothing remains to be done by the vendor, as between him and the vendee, the vendor immediately acquires a property in the price, and the vendee a property in the goods, and then all the consequences resulting from the vesting of the property follows, one of which is, if it be destroyed, the loss falls on the vendee."

In this case the circuit court certifies that it was proved that on the 15th day of January, 1855, the *Ohio company* sold and delivered the boat to the defendants, who promised to pay therefor 16,500 dollars in instalments, and that the defendants were in possession of the boat from the time of the contract, to the time of the levy of the attachment.

I regard the bill of sale and the agreement as constituting the whole contract of sale; that these two documents establish the absolute sale of the boat to the defendants, the price to be paid, and time, manner and means of payment, and nothing remained to be done by the *Ohio* company to perfect the contract and vest the title in the defendants.

Suppose the boat had been consumed by fire, or lost by flood, the day after the agreement was made, whose loss would it have been? Surely not the *Ohio* company's; it would have been the loss of the defendants; and according to the case of Chapman *vs.* Campbell, above cited, this is the test of ownership.

When the boat was delivered to the defendants, under the agreement, nothing remained in the vendor of ownership, either absolute or contingent, except the right reserved to rescind the contract; this has not been done.

Could the *Ohio* company have maintained an action of detinue against the defendants, for the recovery of the boat, before it elected to rescind the contract? I apprehend not: see 3 Leigh, 134. Nothing remained in the company after the date of the contract, that could be attached under *this* attachment. The boat was not the property of the *Ohio* company and liable to the plaintiff's attachment, unless the act of Congress of 1850 regulating the registry of steamboats navigating the *Ohio* river rendered invalid the sale of the boat, notwithstanding the possession of the boat was taken by the purchasers under the contract of sale. I am of opinion it did not: and it was not so intended by Congress. The act expressly provides that no bill of sale of any vessel of the United States, shall be valid against any persons not having *actual notice thereof*, unless registered in the manner stated in the act. In this case, the defendants, from the time of the contract of purchase to the time the boat was levied on, were in continued actual possession of the boat, under their purchase; and such actual possession was notice, to all persons, of the right by which they held possession: 2 Tucker's Com. 438-39. The registry act does not apply where possession of the goods is taken by the vendee: see *Clark* vs. *Ward*, 12 Grat. 440, 13 Grat. 630, where the registry acts are considered.

The plaintiffs having notice of the bill of sale, arising from the possession of the boat, registry of the bill was not necessary to give them a valid title: *Hozey* vs. *Buchanan*, 16 Peter's Rep. 215. The leading object of the registry act, is to avoid the injurious consequences of permitting the right of property to be in one when actual possession is in another.

It was earnestly insisted by the attorneys for the plaintiffs, that the transactions between the *Ohio* company and the defendants, show the contract between them to be a mort-

gage, and not an absolute sale. Suppose it be a mortgage, drawn up in due technical form, by which the legal title to the boat would be in the defendants, and the right of redemption in the *Ohio* company, can the plaintiffs, in the form of proceeding they have elected to pursue at law, obtain a judgment, or order, to sell the equity of redemption of the *Ohio* company? We know the court of appeals of *Virginia* has determined that an equity of redemption in personal estate cannot be sold under a *fi-fa*.

My opinion is, that the only remedy of the plaintiffs for the collection of their debt, under the facts and circumstances disclosed in the record, was by a bill in chancery against these parties; treating the *Ohio* company as nonresident debtors and the defendants as resident debtors to that company; or by attachment at law against the company, and summoning the defendants as garnishees, if they were indebted to the company.

If the transaction be a mortgage, how could a court of law, in this form of proceeding, convene all the creditors whose debts were incurred by the company in building, equipping, fitting out and furnishing the boat, as stated in the agreement?

Our statutes authorizing attachments at law do not direct how such convention of creditors can be effected; the law courts have no such powers; but in a court of equity the proceeding in such cases is familiar.

The judgment of the circuit court was affirmed with costs to defendants.